UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

JON CULVAHOUSE, et al.,          )
                                 )
                    Plaintiffs   )
                                 )
          vs.                    )          CAUSE NO. 3:06-CV-313 RM
                                 )
CITY OF LaPORTE, INDIANA,        )
                                 )
                    Defendant    )

OPINION AND ORDER

Both sides seek summary judgment on the issue of whether sidewalks in the City of LaPorte violate Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* In reliance on 42 U.S.C. § 12132, the plaintiffs say the City's sidewalks qualify as a "service, program, or activity" within the meaning of the ADA, so the City must make the sidewalks readily accessible to people with disabilities. The City responds, first, the sidewalks don't constitute a service, program, or activity under the ADA; second, maintenance of existing sidewalks is the home owner's responsibility under LaPorte City Ordinance No. 733, so requiring the City to repair or improve sidewalks would require implementation of a new service, program, or activity contrary to the ADA's requirements; and, third, granting the requested relief would result in an undue financial burden to the City.

Realizing that these motions have been pending for far too long, the court apologizes for the delay and to prevent further delay declines to re-open briefing

on the motions. After considering the parties' arguments, the applicable provisions of the ADA and its 2008 Amendments, and the supplemental authorities cited by the parties, the court denies the City's motion and grants the plaintiffs' motion in part.

FACTS

The parties agree that the sidewalks in residential areas of LaPorte are in bad repair and use of those sidewalks by persons with disabilities is difficult or, in some instances, impossible. Plaintiff Alvin Levendoski is a 77-year-old City resident who uses a motorized chair to travel from place to place because he can't walk. Mr. Levendoski reports that he is unable to travel on sidewalks in LaPorte because many sections are missing and the existing sidewalks are extremely uneven. He explains that being able to use the sidewalks would allow him to visit friends, travel to stores downtown, and attend meetings and activities at the City's Civic Auditorium. Mr. Levendoski reports, too, that he must drive his chair in the street for some blocks travel to his therapy sessions at LaPorte Hospital because the sidewalks on the route to the hospital are unpassable, even in his chair.

Plaintiff Jon Culvahouse is a 55-year-old blind resident of the City of LaPorte who travels via his manual wheelchair or, when using his prosthesis, with his guide dog. Although the sidewalks in the block around Mr. Culvahouse's residence are new, the condition of the sidewalks outside that area make his travel very difficult and often dangerous. Mr. Culvahouse says he can't walk on the

uneven sidewalks when with his dog, and he must travel in the street if he is in his wheelchair. Mr. Culvahouse says there are many places he would go were the sidewalks passable — to meetings at the Civic Auditorium and to his granddaughter's school to meet with her teachers (he has custody of his granddaughter) — but the lack of accessible sidewalks prohibits him from doing so.

The plaintiffs say the experiences of Messrs. Levendoski and Culvahouse aren't unique; many other disabled City residents are unable to walk on the rough and uneven sidewalks, which often results in their having to walk in the street. The plaintiffs note that the City has a bus service, but say they often are unable to utilize the service because the buses aren't available after 8:00 p.m. on week nights, after 3:00 p.m. on Saturdays, or at all on Sundays. In addition, Mr. Culvahouse, who is blind, says he has difficulty locating bus stops, and if he does locate a stop, he can't easily board a bus and City bus drivers aren't allowed to get off the bus to assist riders.

In 2007, Schneider Corporation of Indianapolis conducted a survey of the sidewalks in LaPorte to see what work would be needed to update the City's sidewalk and curb ramp system. Schneider estimated that making the sidewalks ADA compliant would cost $33.4 million: $11.5 million for repairing or replacing 43.8 linear miles of existing sidewalks and curb ramps, and $21.9 million for constructing 116 linear miles of sidewalks and curb ramps where none presently

exist.[1] The plaintiffs claim the estimate is too high. They acknowledge that the ADA doesn't require installation of sidewalks where none currently exist, so because they "are only requesting that existing sidewalks be made readily accessible to and usable by persons with disabilities," they estimate the cost of the necessary work to be around $5.8 million, plus some additional costs for concrete removal.

Even if the parties could agree on the extent and cost of the needed work, they disagree about who has the responsibility to undertake and pay for the work. The plaintiffs say the City is obligated to repair the sidewalks under the ADA, an Indiana statute, and 120 years of Indiana case law. The City disagrees and claims it has no obligation to repair the sidewalks. According to the City, sidewalks don't qualify as a "service, program, or activity" under the ADA and a 1939 LaPorte Ordinance imposes a duty on real estate owners, not the City, to maintain and repair the sidewalk(s) located on their property. The City also says that because historically it has chosen to not provide sidewalks and sidewalk maintenance to its citizens, any requirement to undertake such work now would amount to a new service not required by the ADA.

Recognizing that a sidewalk project would be a costly undertaking, the plaintiffs say funding options are available to the City to help defray the costs. For example, in 2004 the City began receiving Community Development Block Grant

---

[1] The Schneider survey included an inventory of the curb ramps within the City, but the issue of curb ramps was resolved by prior agreement of the parties. *See* Stipulation for Partial Settlement of Action [docket # 66] and Amended Order Approving Stipulation [docket # 101].

funds available through the Department of Housing and Urban Development to help cities address housing and community development needs and aid eligible residents whose income and resources fall below prescribed limits and who are in need of improvements on their property. From 2004 to 2007, the City used some $168,000 in CDBG funds to aid eligible applicants, including plaintiff Al Levendoski, who qualified to have the sidewalk in front of his house replaced and an interior staircase and wheelchair lift installed in his house. The plaintiffs note, too, that the City has undertaken and financed several sidewalk projects in the last few years, including the installation of new, as well as the repair of existing, sidewalks. The plaintiffs say the City should be required to formulate a plan to set aside and/or obtain funds for the repairs and improvements necessary to render the City's unimproved sidewalks ADA compliant. The City, on the other hand, claims that any requirement to repair and maintain sidewalks would create an undue financial burden that would deprive City residents of other critical services and result in bankruptcy for the City.

The plaintiffs have moved for summary judgment, seeking a declaration that the City's actions and inactions with respect to the repair and maintenance of its sidewalks violate the ADA. The plaintiffs conclude that because the City's sidewalks, when viewed in their entirety, aren't readily accessible to or usable by members of the class, the City should be ordered submit, within thirty days, a plan to bring its existing sidewalks into compliance with the ADA.

The City argues that the plaintiffs' motion should be denied and summary judgment should, instead, be entered in its favor. The City maintains its custom of not providing sidewalks or sidewalk maintenance to any of its citizens is non-discriminatory. The City argues that it shouldn't now be required to repair or improve its sidewalks because sidewalks don't constitute a "service, program, or activity" under the ADA, LaPorte Ordinance No. 733 relieves the City of responsibility for upkeep, repair, or improvement of its sidewalks, and a requirement to repair or improve its sidewalks would create an undue burden and financial hardship to the City.

SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In deciding whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). No genuine issue of material fact exists when a rational trier of fact could not find for the nonmoving party even when the record as a whole is viewed in the light most favorable to the nonmoving party. Ritchie v. Glidden Co., 242 F.3d 713, 720 (7th Cir. 2001). "The mere existence of an alleged factual dispute will not defeat a summary judgment

6

motion; instead, the nonmovant must present definite, competent evidence in rebuttal." <u>Butts v. Aurora Health Care, Inc.</u>, 387 F.3d 921, 924 (7th Cir. 2004). The party with the burden of proof on an issue must show that there is enough evidence to support a jury verdict in his favor. <u>Lawrence v. Kenosha County</u>, 391 F.3d 837, 842 (7th Cir. 2004); *see also* <u>Johnson v. Cambridge Indus., Inc.</u>, 325 F.3d 892, 901 (7th Cir. 2003) ("summary judgment 'is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events'" *(quoting* <u>Schacht v. Wisconsin Dep't of Corr.</u>, 175 F.3d 497, 504 (7th Cir. 1999)).

The existence of cross-summary judgment motions doesn't imply that there are no genuine issues of material fact: "[p]arties have different burdens of proof with respect to particular facts; different legal theories will have an effect on which facts are material; and the process of taking the facts in the light most favorable to the non-movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail without a trial." <u>R. J. Corman Derailment Servs., LLC v. International Union of Operating Eng'rs, Local 150</u>, 335 F.3d 643, 647-648 (7th Cir. 2003). The court isn't required to grant summary judgment for either side when faced with cross-motions. "Rather, the court is to evaluate each motion on its merits, resolving factual uncertainties and drawing all reasonable inferences against the movant." <u>Crespo v. Unum Life Ins. Co. of America</u>, 294 F. Supp.2d 980, 991 (N.D. Ind. 2003) (citations omitted); *see also* <u>O'Regan v. Arbitration Forums, Inc.</u>, 246 F.3d 975, 983 (7th Cir. 2003) ("With

cross-motions, our review of the record requires that we construe all inferences in favor of the party against whom the motion under consideration is made.").

The Americans with Disabilities Act prohibits discrimination against people with disabilities in the areas of "employment, which is covered by Title I of the statute; public services, programs, and activities, which are the subject of Title II; and public accommodations, which are covered by Title III." <u>Tennessee v. Lane</u>, 541 U.S. 509, 516-517 (2004). Title II, the provision at issue this case, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Under Title II, public entities include state and local governments and their departments, agencies, and instrumentalities, 42 U.S.C. § 12131(1)(A) & (B), and persons with disabilities are "qualified" individuals if they, "with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meet[] the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

One claiming that a public program or service violates the ADA must establish "(1) that he [or she] has a qualifying disability; (2) that he [or she] is

being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his [or her] disability." <u>Frame v. City of Arlington</u>, 575 F.3d 432, 435 (5th Cir. 2009); *see also* <u>Wisconsin Comm'y Servs., Inc. v. City of Milwaukee</u>, 465 F.3d 737, 752 (7th Cir. 2006) ("Title II case law . . . requires the plaintiff to show that, "but for" his disability, he would have been able to access the services or benefits desired."); <u>Geiger v. City of Upper Arlington</u>, No. 2:05-cv-1042, 2006 WL 1888877, at *1 (S.D. Ohio July 7, 2006) ("In other words, the plaintiff must show that he was denied 'a public benefit' because he or she is disabled."). The plaintiffs may establish discrimination by presenting evidence that the defendant intentionally acted on the basis of the disability, the defendant refused to provide a reasonable modification, or the defendant's denial of benefits disproportionately impacts disabled people. <u>Washington v. Indiana High Sch. Athletic Assoc., Inc.</u>, 181 F.3d 840, 847 (7th Cir. 1999). "Title II imposes an affirmative obligation on public entities to make their programs accessible to qualified individuals with disabilities, except where compliance would result in a fundamental alteration of services or impose an undue burden." <u>Toledo v. Sanchez</u>, 454 F.3d 24, 32 (1st Cir. 2006).

The parties don't dispute that all members of the class are "qualified individuals with disabilities" within the meaning of the ADA and have standing to

bring this action,[2] or that the City of LaPorte is a public entity subject to the requirements of Title II of the ADA. 42 U.S.C. § 12131(a)(A) & (B). At issue is whether the plaintiffs have suffered discrimination on the basis of their disabilities by being denied access to "services, programs, or activities" for which the City has liability under Title II. 42 U.S.C. § 12132.

*Sidewalks as a "Service, Program, or Activity"*

The plaintiffs argue that the City's sidewalks qualify as a "service, program, or activity" under 28 U.S.C. § 12132. The terms should be construed broadly to include sidewalks, the plaintiffs say, because accessible sidewalks are essential to their ability and opportunity to travel. The plaintiffs contend sidewalks are "general government services" and cite in support <u>Everson v. Board of Educ. of Ewing Twp.</u>, 330 U.S. 1, 17-18 (1947), in which the Court viewed sidewalks as government services ("parents might be reluctant to permit their children to attend schools which the state had cut off from such general government services as ordinary police and fire protection, connections for sewage disposal, public highways and sidewalks"), and <u>Barden v. City of Sacramento</u>, 292 F.3d 1073 (9th Cir. 2002), in which the court broadly construed "services, programs, or activities"

_____

[2] The plaintiff class in this action is defined as "all persons who live or will live in or who visit or will visit the City of LaPorte, Indiana, and who, because of a disability as defined by the Americans with Disabilities Act, (1) use wheelchairs or other wheeled devices for movement, or (2) have gait disturbances, or (3) have other difficulties in ambulation." Order of Dec. 22, 2006 [docket # 47]. And while the definition of "disability" was modified slightly in the 2008 ADA Amendments, *see* 42 U.S.C. § 12102(1) (Supp. 2009), that modification doesn't change the status of the plaintiffs as "qualified individuals with disabilities."

to include "'all of the operations of' a qualifying local government." 292 F.3d at 1077 (relying on definition of "program or activity" in Rehabilitation Act, 29 U.S.C. § 794(b)(1)(A), as applicable to the ADA). In concluding that maintaining the accessibility of sidewalks for individuals with disabilities "falls within the scope of Title II," 292 F.3d at 1076, the <u>Barden</u> court explained that

> [r]equiring the City to maintain its sidewalks so that they are accessible to individuals with disabilities is consistent with the tenor of [28 C.F.R.] § 35.150, which requires the provision of curb ramps, 'giving priority to walkways servicing' government offices, 'transportation, places of public accommodation, and employers,' but then 'followed by walkways serving other areas.' 28 C.F.R. § 35.150(d)(2). Section 35.150's requirement of curb ramps in all pedestrian walkways reveals a general concern for the accessibility of public sidewalks, as well as a recognition that sidewalks fall within the ADA's coverage, and would be meaningless if the sidewalks between the curb ramps were inaccessible.

292 F.3d at 1077. The plaintiffs ask the court to adopt the <u>Barden</u> court's conclusion that "Title II's prohibition of discrimination in the provision of public services applies to the maintenance of public sidewalks, which is a normal function of a municipal entity." *Id.*

The City argues that "[w]hile the ADA strives to achieve equality for disabled citizens, plaintiffs are greatly overreaching in their attempt to lump sidewalks into the statutory category of 'service, program, or activity.'" According to the City, courts have ruled routinely that some functions performed by public entitles don't constitute services, programs, or activities, and the plain language of 28 U.S.C. § 12132 doesn't bring sidewalks within the statute's reach or extend its coverage to "anything a public entity does." The City suggests that a service, program, or

activity would be better defined as "requiring some sort of intentional action or output" by the City: "An existing sidewalk is not an action or output. It is simply a structure that exists in LaPorte at the whim of a property owner and is completely independent of any ongoing program, service, or activity offered or sponsored by City."

The City notes that the ADA regulations set forth a two-part framework addressing accessibility requirements: one relating to new facilities, 28 C.F.R. § 35.151, and the second relating to existing facilities, 28 C.F.R. § 35.150. New facilities — those built or altered after January 26, 1992 — must be made readily accessible to and usable by individuals with disabilities, a requirement with which the City says it complies. In the case of a facility existing before the enactment of the ADA, the City says only the programs, services, or activities offered inside the building need be accessible; the ADA doesn't require that disabled individuals receive "instant access to the entire infrastructure of a city. Given that even important city buildings where programs, services or activities need not necessarily be made fully ADA compliant, it strains credibility to suggest that Congress intended to require immediate ADA compliance for all sidewalks within a city." The City concludes that the plaintiffs and the <u>Barden</u> court are "overreaching and wrong in their attempts to define a program, service, and/or activity of City to include sidewalks."

Title II prohibits a public entity from excluding disabled individuals from participating in, or denying them the benefits of, its "services, programs, or

activities." 42 U.S.C. § 12132. The statute doesn't define the terms "services, programs, and activities," but the applicable regulations provide that Title II "applies to anything a public entity does," <u>Oconomowoc Residential Programs, Inc. v. City of Milwaukee</u>, 300 F.3d 775, 782 (7th Cir. 2002) (*citing* 28 C.F.R. pt. 35, app. A), and most courts that have considered the phrase have concluded that the terms are to be defined broadly. *See, e.g.,* <u>Barden v. City of Sacramento</u>, 292 F.3d 1073, 1076 (9th Cir. 2002) (court viewed the focus of the inquiry to be "not so much whether a particular public function can technically be characterized as a service, program, or activity, but whether it is 'a normal function of a governmental entity'" because "[a]ttempting to distinguish which public functions are services, programs, or activities, and which are not, would disintegrate into needless 'hair-splitting arguments'"); <u>Johnson v. City of Saline</u>, 151 F.3d 564, 569 (6th Cir. 1998) ("[W]e find that the phrase 'services, programs, or activities' encompasses virtually everything that a public entity does."); <u>Yeskey v. Pennsylvania Dep't of Corrections</u>, 118 F.3d 168, 171 (3d Cir. 1997) ("[Title II's] regulations state that the statute's coverage extends to 'all services, programs, and activities provided or made available by public entities.' This broad language is intended to 'appl[y] to anything a public entity does.'" (*citing* 28 C.F.R. § 35.201(a) and pt. 35, App. A)); <u>Innovative Health Sys., Inc. v. City of White Plains</u>, 117 F.3d 37, 44-45 (2d Cir. 1997) ("[T]he language of Title II's anti-discrimination provision does not limit the ADA's coverage to conduct that occurs in the 'programs, services, or activities' of the City. Rather, it is a catch-all phrase that prohibits all

discrimination by a public entity, regardless of the context, and that should avoid the very type of hair-splitting arguments the City attempts to make here."), *superceded on other grounds,* <u>Zervos v. Verizon N.Y., Inc.</u>, 252 F.3d 163, 171 n.7 (2d Cir. 2001); *contra* <u>New Jersey Protection and Advocacy, Inc. v. Township of Riverside</u>, No. 04-5914, 2006 WL 2226332, at *3 (D.N.J. Aug. 2, 2006) ("this court deigns to find that sidewalks are, in and of themselves, programs, services, or activities for the purpose of the ADA's implementing regulations").

The court agrees that the ADA is to be construed broadly, and while the statute may not mandate that the phrase "services, programs, or activities" encompass, without exception, all things that a public entity does, the ADA is broad enough to include public sidewalks within the scope of a city's services, programs, or activities. *See* <u>Frame v. City of Arlington</u>, 575 F.3d 432, 437 (5th Cir. 2009) (noting that "Congress envisioned that the ADA would require that local and state governments maintain disability-accessible sidewalks," citing H.R. Rep. No. 101-485, pt. 2, at 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 367 ("The employment, transportation, and public accommodation sections of this Act would be meaningless if people who use wheelchairs were not afforded the opportunity to travel on and between the streets.")); <u>Ability Center of Greater Toledo v. City of Sandusky</u>, 385 F.3d 901, 910 (6th Cir. 2004) ("In stating that public entities shall not deny qualified disabled individuals the benefits of public services, [§ 12132] necessarily requires that public entities provide such individuals the means necessary to acquire access to these services.").

*Responsibility for Sidewalks*

The City next claims that even if the court determines that sidewalks are a service, program, or activity under the ADA, the City has no obligation to repair or maintain its sidewalks because the City doesn't own them. The City says LaPorte Ordinance No. 733 governs. That Ordinance, approved on September 5, 1939, provides that

> it shall be unlawful for the owner of any real estate in the City of LaPorte to allow the sidewalk on said real estate provided for and used by the general public to become defective, out of repair and dangerous to the general public [and] it shall be the duty of persons owning real estate within said City to repair said sidewalk used and provided for the general public whenever the same have become out of repair and dangerous to the pedestrians of the City.

The Ordinance's language is now included in the Municipal Code of the City of LaPorte as Section 90-91. The City says its hands-off policy is further evidenced by the "hodge-podge and haphazard existence of sidewalks" within the City, which the City claims results from sidewalks being constructed at the whim of property owners completely independent of any ongoing program, service, or activity offered or sponsored by the City. Deft. Memo., at 10.

The court can't agree with the City's position. Indiana municipalities have "exclusive jurisdiction over bridges[], streets, alleys, sidewalks, watercourses, sewers, drains, and public grounds inside [their] corporate boundaries, unless a statute provides otherwise." IND. CODE § 36-1-3-9(a). Indiana courts over the years have continued to recognize municipalities' authority and duty to keep their sidewalks in a reasonably safe condition for use by the public. *See* Dooley v. Town

of Sullivan, 14 N.E. 566, 567 (Ind. 1887) ("It is clear that the town has authority over sidewalks, and is under a duty to use ordinary care to keep them in a reasonably safe condition for use by those who exercise ordinary care."); Town Council of New Harmony v. Parker, 726 N.E.2d 1217, 1227 (Ind. 2000) ("[A] municipal body has exclusive control over, and regulation of, its streets."); Wickwire v. Town of Angola, 30 N.E. 917, 918 (Ind. Ct. App. 1892) ("Cities and towns in this state have control of streets and sidewalks within their respective limits, and are bound to exercise reasonable care to keep them in a safe condition for travel. This duty is primary, and cannot be delegated to another so as to transfer the responsibility."); Town of Highland v. Zerkel, 659 N.E.2d 1113, 1120 (Ind. Ct. App. 1995) ("the trial court correctly instructed the jury that the duty to maintain the reasonably safe condition of town sidewalks lies solely with Highland and that the homeowners abutting the sidewalk have no duty to repair the sidewalks"); Denison Parking, Inc. v. Davis, 861 N.E.2d 1276, 1280 (Ind. Ct. App. 2007) ("A municipality has a common law duty to exercise reasonable care and diligence to keep its streets and sidewalks in a reasonably safe condition for travel. However, there is no similar corresponding duty for owners of property abutting a public sidewalk.").

In addition, various sections of LaPorte's Municipal Code confirm the City's authority and control over its sidewalks. *See, e.g.,* Section 90-61 ("It is unlawful for any person to construct or attempt to construct a cement sidewalk or curb in the city without a permit."); Section 90-65 ("All curbs and sidewalks constructed

pursuant to a permit . . . shall be constructed in all respects to conform to the general sidewalk specifications adopted by the Board of Public Works and Safety."); Section 90-78 ("In instances where there do not exist any adequate facilities for unloading or uncrating merchandise other than on the public sidewalks, a permit for the unloading of merchandise on the sidewalk shall be obtained from the chief of police."). And though Section 2 of LaPorte's Ordinance No. 733 and Section 90-92 of its Municipal Code provide that if a sidewalk becomes defective, out of repair, or dangerous to the general public, the City Street Department may make the repairs with the cost of the work to become a lien and collected as a tax on the property, a requirement that property owners pay for sidewalk repairs doesn't relieve the City of its responsibility over its sidewalks or its "common law duty to exercise reasonable care and diligence to keep its streets and sidewalks in a reasonably safe condition for travel." Denison Parking, Inc. v. Davis, 861 N.E.2d 1276, 1280 (Ind. Ct. App. 2007); *see also* Town Council of New Harmony v. Parker, 726 N.E.2d 1217, 1227 (Ind. 2000) ("[A] municipal body has exclusive control over, and regulation of, its streets. With this control comes the power to assess property owners for improvements upon or maintenance of streets." (internal citations omitted)). The court concludes, contrary to the City's claim, the City has exclusive jurisdiction and responsibility for its sidewalks and an obligation to maintain its sidewalks so that the sidewalk system, "when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a).

17

*The City's Affirmative Defenses*

The City argues that even if the court determines that sidewalks are a "service, program, or activity" and the City has a duty to maintain its sidewalks, it still is entitled to summary judgment based on its affirmative defenses. Before the court can address the merits of the City's defenses, it must decide whether the plaintiffs have established that the sidewalks in LaPorte, when viewed in their entirety, are not readily accessible to and usable by individuals with disabilities. The plaintiffs must show that "but for" their disabilities, they would have been able to access the services or benefits desired, that is, use of the sidewalks in LaPorte. <u>Wisconsin Comm'y Servs., Inc. v. City of Milwaukee</u>, 465 F.3d 737, 752 (7th Cir. 2006).

The plaintiffs rely on the testimony and statements of Jon Culvahouse, who is blind and has had his right leg amputated below the knee. Mr. Culvahouse says that because the sidewalks in the City are rough and uneven, he can't walk on them, even with the assistance of his guide dog, or operate his wheelchair on them. Mr. Culvahouse reports he has made requests to the Mayor of LaPorte and a City councilman for the sidewalks to be fixed: "I went to the mayor and I asked him to fix the sidewalks. I have 14 people in my family that are blind, and we sure could use smooth steps, sidewalks to walk on. And two of us have leader dogs. I wasn't asking for the whole town at that time. I was just asking for a couple of blocks here and a couple of blocks there to make it accessible for my family to be safe like to go to Kroger's, and go to the bank, go to the library, stuff like that."

18

Culvahouse Dep., at 5-6. Mr. Culvahouse says he can't walk on the uneven sidewalks in LaPorte, he has been thrown from his wheelchair on four occasions because of defects in the sidewalks, he can't navigate various ramp areas on sidewalks and at City Hall where the inclines are too steep, his wheelchair often gets stuck on uneven sidewalk and ramp areas, and he is forced to travel in the street in certain areas of the City, including the area around the City's Civic Auditorium, because the sidewalks are too uneven for him to navigate on foot and in his wheelchair. Mr. Culvahouse says he has talked to many other disabled residents of LaPorte who echo his problems in using the City's sidewalks.

The plaintiffs also presented testimony and statements from Alvin Levendoski, another disabled resident of LaPorte, who travels in a motorized chair because he is unable walk. Mr. Levendoski reports that he uses the City's TransPorte buses, but if a bus isn't available he has to travel in the street because the sidewalks are impassable. Mr. Levendoski says traveling in the street is dangerous for him and because bus service ends at 8:00 p.m. and his wheelchair doesn't have lights for travel in the street, he can't go out after dark at all. As a result, he ends up missing city and county meetings that take place in the evening. He says he can't attend functions at City Hall because the ramp at the facility is too steep for his chair to climb. He says he knows of other disabled residents in LaPorte who are forced to travel in the streets because they are unable to walk on the uneven sidewalks. Mr. Levendoski reports that when he

asked his City councilman if the sidewalks could be repaired, the councilman said he "would look into it, end of conversation."

The City hasn't challenged the statements of Mr. Culvahouse or Mr. Levendoski that the condition of LaPorte sidewalks prohibits them, as disabled individuals, from accessing and using the sidewalks. In fact, the City's recitation of facts about the condition of its sidewalks supports the plaintiffs' claim that the condition of those sidewalks prohibits disabled individuals from having access to them.[3] The City's only argument is that the plaintiffs haven't established a prima facie case because "LaPorte sidewalks are not a public entity's service, program, or activity," an argument already rejected.

The plaintiffs have presented evidence that they have been denied access to City services, programs, or activities and that the denial of that access is by reason of their disabilities — "but for" their disabilities, they would have been able to access and utilize sidewalks in the City of LaPorte. The facts set forth by both sides establish that the City's sidewalk system, when viewed in its entirety, isn't readily accessible to and usable by individuals with disabilities. The plaintiffs have carried their burden and presented a prima facie case of discrimination by the

---

[3] According to the City, random portions of its existing sidewalks are made of concrete, paving stone, bricks, asphalt, and/or wood, and some areas have no sidewalks at all. "It is not uncommon to see in a given city block a sidewalk in front of one house, no sidewalk next door, and then sidewalks in front of the next home on the block, [with many homes having a] sidewalk that traverses only to part of the property and then stops well short of the curb. Further, some of the existing sidewalks have been constructed within the public right-of-way and some have not." Deft. Memo., at 3-4.

City of LaPorte under Title II of the ADA. The finding of liability on the part of the City leads the court to the City's affirmative defenses.

The regulations applicable to existing facilities, including sidewalks,[4] require a public entity to make its services, programs, and activities readily accessible to and usable by individuals with disabilities. 28 C.F.R. § 25.150(a). The entity must also "maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities." 28 C.F.R. § 25.133. In doing so, an entity isn't "[n[ecessarily require[d] . . . to make each of its existing facilities accessible to and usable by individuals with disabilities . . . [or] to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." 28 C.F.R. § 35.150(a)(1) & (3). The City claims imposition of any requirement to repair, modify, or maintain its sidewalks would amount to an alteration of a service, program, or activity and an undue financial burden, affirmative defenses upon which the City bears the burden of proof. *See* 28 C.F.R. Pt. 35, App. A ("The burden of proving that compliance with paragraph (a) of § 35.150 would fundamentally alter the nature of a service, program, or activity or would result in undue financial and administrative burdens rests with the public entity."); *cf.* Oconomowoc Residential Programs, Inc. v. City of Milwaukee, 300 F.3d 775, 783 (7th Cir. 2002) ("The

---

[4] "Facility" is defined, in relevant part, as including "all or any portion of buildings, structures, . . . roads, walks, passageways, [and] parking lots." 28 C.F.R. § 35.104.

burden is on the plaintiffs to show that the accommodation it seeks is reasonable on its face. Once the plaintiffs have made this prima facie showing, the defendant must come forward to demonstrate unreasonableness or undue hardship in the particular circumstances."); Dadian v. Village of Wilmette, 269 F.3d 831, 840-841 (7th Cir. 2001) ("we conclude that a public entity that asserts the reason it failed to accommodate a disabled individual was because she posed a direct threat to safety bears the burden of proof on that defense").

### (1) Alteration of Service, Program, or Activity

The City says historically it has undertaken no work on city sidewalks, so "were LaPorte to provide sidewalks to non-disabled residents while refusing to do so for its disabled residents, such action would indeed violate the ADA. However, City currently provides exactly the same amount of sidewalk construction and maintenance to all its residents — none. And . . . where all are treated equally, discrimination does not exist." The City maintains the ADA doesn't require the provision of new or altered services, so any requirement that it undertake sidewalk construction or maintenance would violate the ADA.

The plaintiffs challenge the City's claim that it has never provided or maintained sidewalks. They point to the deposition testimony of LaPorte Mayor Leigh Morris that in 1997, the City began the Redevelopment Commission's downtown revitalization project that included downtown sidewalk repair and installation of curb ramps; in August 2002, the City's Board of Public Works voted

to fund a sidewalk repair project; from 2001-2005, the City had a formal sidewalk repair program to deal with sidewalk issues near schools and other high pedestrian areas where no sidewalks existed; beginning in 2001, the City participated in a program where residents could apply for sidewalk repairs with a 50-50 cost split between City and real estate owners; on at least two occasions, the City installed sidewalks for handicapped residents; and the City currently has plans for street and sidewalk construction projects based on receipt of "Major Moves" funding from the state.

The City has countered with the affidavit of Mary Jane Thomas, the LaPorte City Planner and Director of Community Development and Planning, who says that during her tenure with the City (from October 1984 to the present), the City has undertaken a limited number of sidewalk projects. Ms. Thomas also says City funds weren't used in financing some of those projects: downtown tax increment finance district revenue and bonds issued by the City's Redevelopment Commission were used for the 1997 rehabilitation of the downtown business district; an Indiana Department of Commerce Community Focus Grant was used in 1999 to reconstruct streets, sewers, water lines, and sidewalks in regularly-flooded areas of the City; in 2005, the City received federal funds for its Community Development Block Grant Program; and in 2006, Enterprise Zone funds were used to paid for sidewalk repair within the Enterprise Zone.

The evidence presented by the plaintiffs and by the City, as well, contradicts the City's claim that "sidewalk provision is not and never has been a program,

service, or activity of the City." That some of its sidewalk projects weren't financed by moneys from its general fund doesn't change that construction, repairs, and improvements of sidewalks has been occurring in LaPorte. While the City might not call the sidewalk projects undertaken over the years a "service" or "program," the testimony of Mayor Morris and City Planner Thomas establishes that the City has constructed and repaired sidewalks in various parts of LaPorte, so being required to continue to do so doesn't amount to a new service or program or a fundamental alteration in the repair and maintenance of its sidewalks system. *See* 28 C.F.R. § 35.130(a)(3) ("A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration . . . that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability."). The City hasn't carried its burden of establishing this affirmative defense.

### (2) Undue Financial Burden

The City's last claim is that providing sidewalk repair and maintenance would be an undue financial burden. Under 28 C.F.R. § 35.150(a)(3), the City has submitted the Declaration of Mayor Leigh Morris, who estimates the cost of bringing all existing sidewalks into ADA compliance to be around $11.5 million, not including sidewalk maintenance. He says that amount

> exceeds the City's entire annual operating budget. Therefore, in order to complete this construction task, the City would have to suspend major public services such as police and fire protection, the Parks

Department, and funding assistance provided for Transports. The City's financial difficulties are made more difficult by a frozen levy placed on it by the state legislature. The City may only raise its operating budget by a maximum of less than 5% annually. Further, the City of LaPorte lacks the capacity to raise $11 million through bonding. Even when all available resources are taken into account, spending the amount necessary to repair and maintain all sidewalks within the city will likely force the City into bankruptcy. . . . For these reasons, I hereby certify . . . that compliance with an order to repair and maintain all sidewalks within the city limits of LaPorte would result in an undue financial burden to the City of LaPorte, Indiana.

Morris Dec., ¶¶ 7-10, 11.

The City maintains it has no available resources to spare, especially when considering that "[t]he expenses associated with plaintiffs' demands do not stop once the renovation project is completed for the first time. Monitoring and replacing sidewalks indefinitely could continually consume a huge percentage of City's annual budget at the expense of various other projects that would benefit all citizens in the community." The City says the drafters of the ADA couldn't have contemplated requiring a city to bankrupt itself and suspend critical city services in favor of sidewalk construction: "the provision of access for disabled individuals should not trump all other services upon which the City's more than 21,000 other residents depend." The City also claims that because so many sidewalk sections are missing, repair of the existing walkways still might result in plaintiffs not being able to travel around the City with the ease they seek and that factor, together with the financial considerations, weighs in favor of a determination that the remedy sought by the plaintiffs creates an undue burden on the City of LaPorte.

The plaintiffs respond that the City can't establish an undue burden based solely on the fact that the City doesn't have the money budgeted today to pay for sidewalk repairs that, according to the plaintiffs, should have been completed by January 26, 1995, citing to 28 C.F.R. § 35.150(c). The plaintiffs suggest various funding options that would be available to assist the City in a sidewalk program. For example, Indiana's Barrett Law, IND. CODE § 36-9-38-1 *et seq.*, provides a funding mechanism that would allow the City to make necessary sidewalk repairs with the cost to be repaid, over time, by property owners. The plaintiffs note Mayor Morris's acknowledgment that the City wouldn't be required to go beyond its bonding limits to take advantage of funding under the Barrett Law. The plaintiffs also point to Mayor Morris's testimony that the City has received $4.5 million in "Major Moves" moneys, a portion of which might be used on new sidewalks. The plaintiffs say they appreciate the budgetary restraints and limitations that must be considered, as evidenced by their proposal in the parties' Stipulation for Partial Settlement that the City have until 2018 to complete the curb ramp project. But, the plaintiffs say, the City shouldn't be permitted to ignore its obligations under the ADA by claiming undue financial burden, especially in light of the City's failure to exhaust available resources as required by 28 C.F.R. § 35.150(a) or suggested other options for compliance with Title II.

A public entity isn't required to make structural changes in existing facilities "where other methods are effective in achieving compliance." 28 C.F.R. § 35.150(b). A public entity may comply with Title II's requirements

through such means as a redesign of equipment, reassignment of services to accessible buildings, assignment of aids to beneficiaries, . . . delivery of services at alternate accessible sites, alteration of existing facilities and construction of new facilities, use of accessible rolling stock or other conveyances, or any other methods that result in making its services, programs, or activities readily accessible to and usable by individuals with disabilities. A public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance with this section.

28 C.F.R. § 35.150(b)(1). In addition, an undue financial burden defense must be based on consideration of "all resources available for use in the funding and operation of the service, program, or activity." 28 C.F.R. § 35.150(a)(3).

The City has set forth evidence of its budgetary limitations and presented evidence demonstrating that sidewalk projects in LaPorte have been completed without using moneys from the City's budget. City Planner Thomas's statements suggest that alternative financing options might be available, but the City hasn't discussed any of those options, hasn't addressed the options found in the regulations or those suggested by the plaintiffs, and hasn't proposed any alternate method(s) for the delivery of its services, programs, or activities to disabled individuals. *See* <u>Tennessee v. Lane</u>, 541 U.S. 509, 532 (2004) ("As Title II's implementing regulations make clear, the reasonable modification requirement can be satisfied in a number of ways."); <u>Parker v. Universidad de Puerto Rico</u>, 225 F.3d 1, 6 (1st Cir. 2000) ("Title II's emphasis on 'program accessibility' rather than 'facilities accessibility' was intended to ensure broad access to public services, while, at the same time, providing public entities with the flexibility to choose how

best to make access available."). The City hasn't carried its burden of proving its undue financial burden defense.

CONCLUSION

Title II of the ADA was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), based on a finding by Congress that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, [and] failure to make modifications to existing facilities and practices." 42 U.S.C. § 12101(a)(5). "The ADA's findings make clear that Congress believed it was attacking 'discrimination' in all areas of public services, as well as the 'discriminatory effects' of 'architectural, transportation, and communication barriers.' " Tennessee v. Lane, 541 U.S. 509, 549 (2004) (*quoting* 28 U.S.C. §§ 12101(a)(3) and (a)(5)) (Rehnquist, J., dissenting).

Under Title II, disabled individuals must be provided with "meaningful access" to a public entity's programs and services. "[T]o assure meaningful access, reasonable accommodations in the [public entity's] program or benefit may have to be made." Alexander v. Choate, 469 U.S. 287, 301 (1985) (discussing the Rehabilitation Act, which also applies to the ADA); *see also* Wisconsin Comm'y Servs., Inc. v. City of Milwaukee, 465 F.3d 737, 746 (7th Cir. 2006) (the ADA

"embrace[s] the concept that, in certain instances, the policies and practices of covered entities must be modified to accommodate the needs of the disabled."); 28 C.F.R. § 35.130(b)(7) ("[A] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the services, program, or activity."). In enacting the ADA, Congress emphasized that "[t]he employment, transportation, and public accommodation sections of [the ADA] would be meaningless if people who use wheelchairs were not afforded the opportunity to travel on and between the streets." H.R. Rep. No. 101-485, pt. 2, at 84 (1990), *reprinted in* U.S.C.C.A.N. 303, 367. "In sum, Title II requires . . . special accommodations for disabled persons in virtually every interaction they have with the State." Tennessee v. Lane, 541 U.S. 509, 549 (2004) (Rehnquist, J., dissenting).

Based on the foregoing, the court

(1) GRANTS the plaintiffs' motion for summary judgment [docket # 76] on the issue of liability and DEFERS resolution of their claim for relief;

(2) DENIES the motion of the City of LaPorte for summary judgment [docket # 79], as well as the City's request for judgment based on is affirmative defenses that repair and maintenance of its

sidewalks would be an alteration of a service, program, or activity and
amount to an undue financial burden;

(3) DENIES the City's motion for further briefing [docket # 107];
and

(4) DENIES as moot the plaintiffs' motion for a ruling [docket
# 106].

Because the court concludes it is unable to determine, based on the record before
it and the passage of time since the submission of relevant financial information,
what options are or may be available to the City to assist with its obligation to
make travel via City sidewalks "readily accessible to and usable by" persons with
disabilities as required under Title II of the ADA, a hearing will be scheduled,
following consultation with counsel, to discuss implementation of the injunctive
relief requested by the plaintiffs.

SO ORDERED.

ENTERED: __December 22, 2009__


__/s/ Robert L. Miller, Jr.__
Chief Judge
United States District Court